# 23-7973

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

Mr. Benjamin Woodhouse,

*Plaintiff-Appellant,*

v.

Meta Platforms Inc. et al.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York
No. 1:23-cv-07000
Hon. Philip A. Engelmayer

_____

## MR. BENJAMIN WOODHOUSE-APPELLANT'S
## OPENING BRIEF

_____


Mr. Benjamin Woodhouse
2975 Bayview Drive
Pismo Beach, CA. 93449
805 709 1995
*Pro Se Appellant*

TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................iii

INTRODUCTION................................................................................1

STATEMENT WITH RESPECT TO ORAL ARGUMENT....................4

ADDENDUM OF STATUTES AND RULES.......................................4

STATEMENT OF SUBJECT MATTER AND APPELLATE JURSIDICTION.....4

STATEMENT OF ISSUES AND STANDARD OF REVIEW..............4

STATEMENT OF THE CASE..............................................................6

SUMMMARY OF THE ARGUMENT.................................................9

ARGUMENT.......................................................................................13

     I.    THE SUPREME COURT HAS RULED THAT IT IS
           ILLEGAL TO PRE-MATURELY DISMISS A MATTER
           IF IT CONTAINS, EITHER, A FEDERAL ISSUE, OR,
           CONSTITUTIONAL QUESTION, THIS MATTER
           CONTAINS BOTH.  THE COURT CITES TO *HAGANS* IN
           *ERRATA*, AS IT STANDS FOR WOODHOUSE'S
           POSITION.........................................................................13

     II.   WOODHOUSE WITNESSED THE TERRORIST EVENTS
           FUNDED BY TRIPLE CONFLICTED COUNSEL, AND HE
           CANNOT LEGALLY BE, EITHER, IMPEACHED, OR,
           HAVE CAPACITY CHALLENGED, WITHOUT A
           DISCOVERY PERIOD BEING ORDERED...............................17

     III.  THE COURT SHOULD HAVE DEFAULTED THE
           CONFLICTED PARTIES, AND ALPHABEIT INC.,
           INDEPENDENTLY, AND UNDER A TOTALITY OF
           CIRCUMSTANCES FOR: A TRIPLE CONFLICT, FOR
           FILING A MOTION WHEN NOT ADMITTED TO THE
           COURT, COMMITTING VIOLATIONS, PATENTLY
           HACKING THE CALIFORNIA APPELLATE SYSTEM,

i

AND ENGAGING IN WITNESSED TERRORIST ACTS..........20

IV.    PUBLIC POLICY DOES NOT ALLOW THE DISTRICT COURT TO UPHOLD THE INCINERATION OF A 9TH CIRCUIT JUDGE, THE DECAPITATION OF WOODHOUSE'S COLLEAGUES, AND TO IGNORE A JUDICIAL CONFLICT DECLARED BY THE DISTRICT JUDGE HERSELF. SUCH A JUDICIAL RULING IS PATENTLY, EITHER, INADVERTENT, OR, ACTUAL, COERCION.....................................................................................24

CONCLUSION.....................................................................................29

CERTIFICATE OF COMPLIANCE

PROOF OF SERVICE

ADDENDUM

TABLE OF AUTHORITIES

Cases:

*Action S.A. v. Marc Rich Co., Inc*., 951 F.2d 504 (2d Cir. 1991).......................3

*Bambu Sales, Inc. v. Ozak Trading Inc*., 58 F.3d 849 (2d Cir. 1995)................3,26

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)..................................1

*Chahal v. Paine Webber Inc.*, 725 F.2d 20 (2d Cir. 1984)................................2

*Combs v. Rockwell Intern Corp. v*., 927 F.2d 486 (9th Cir. 1991).....................14

*Courtenay Communications Corp. v. Hall*, 334 F.3d 210 (2d Cir. 2003).........10,12,

.............................................................................................16

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)...........................................................12

*Golb v. Attorney Gen. of State*, 870 F.3d 89 (2d Cir. 2017)..............................13

*Hagans v. Lavine*, 415 U.S. 528 (1974)..............................................................1,10

*Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).......................................................11

*HBE Leasing Corp. v. Frank*, 22 F.3d 41 (2d Cir. 1994)....................................19

*Hui Lin Huang v. Holder*, 677 F.3d 130 (2d Cir. 2012).......................................5

*In Re American Airlines v.*, 972 F.2d 605 (5th Cir. 1992)...................................20

*IUE AFLCIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993).............18

*Jones v. Sullivan*, 949 F.2d 57 (2d Cir. 1991).......................................................6

*Leftridge v. Connecticut State Trooper Officer*, 640 F.3d 62 (2d Cir. 2011).......28

*Linde v. Arab Bank*, PLC, 882 F.3d 314 (2d Cir. 2018)........................................24

*Livingston v. Adirondack Beverage Company*, 141 F.3d 434 (2d Cir. 1998).......19

*Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98

(2d Cir. 1991)....................................................................................................6

*Michel v. Immigration and Naturalization Serv.*, 206 F.3d 253 (2d Cir. 2000)....5

*Minneapolis Etc. Ry. v. Moquin*, 283 U.S. 520 (1931)...........................................13

*Montero v. Travis*, 171 F.3d 757 (2d Cir. 1999)....................................................16

*Pino v. Ryan*, 49 F.3d 51 (2d Cir. 1995).................................................................16

*Ringgold-Lockhart v. Cnty. of L.A.*, 552 F. App'x 648 (9th Cir. 2014).................15

*Satchell v. Dilworth*, 45 F.2d 781 (2d Cir. 1984)...................................................15

*Staehr v. Hartford Financial Services*, 547 F.3d 406 (2d Cir. 2008)....................11

*Televideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987)....................21

*U.S. v. Awan*, 384 F. App'x 9 (2d Cir. 2010)...........................................................3

*U.S. v. Auen*, 846 F.2d 872 (2d Cir. 1988)..........................................................18,

.............................................................................................................................19

*U.S. v. Coke*, 339 F.2d 183 (2d Cir. 1964).............................................................11

*U.S. v. Gomes*, 387 F.3d 157 (2d Cir. 2004)............................................................5

*U.S. v. McKeon*, 738 F.2d 26 (2d Cir. 1984)..........................................................19

iv

*U.S. v. Hir,* 517 F.3d 1081 (9th Cir. 2008)...........................................................25

*U.S. v. Reich*, 479 F.3d 179 (2d Cir. 2007)...........................................................14

Statutes:

18 U.S.C. Section 1030...........................................................................1,10,

...........................................................................................................14,21

18 U.S.C. Section 1512.......................................................................10,14

18 U.S.C. Section 2442.............................................................................25

28 U.S.C. Section 1291.............................................................................4

28 U.S.C. 1331-2.......................................................................................4

Rules:

*Federal Rules of Evidence 403*...........................................................18

*Federal Rules of Evidence 408*...........................................................1

**INTRODUCTION**

Woodhouse's *Opening Brief* addresses three main components. First, the procedural and substantive defects of the unadmitted filings from Triple Conflicted Counsel, which contained plead criminal conduct. 18 U.S.C. Section 1030. *Federal Rules of Evidence 408*. Specifically, Triple Conflicted Counsel entered privileged attorney communications into record, using a wrongly captioned Motion, despite being unadmitted to the Court. The District Court would go on to grant the *Motion*, raising concerns of capacity. Second, the procedural and substantive defects of the Court's rulings. Such defects include all of the following: citation to Supreme Court case law, which stands for Woodhouse's positions, the failure to address substantial evidence, entered into the record, including a *Conflict Letter* issued from a Central District Federal Judge, and a *Jury Verdict* from a Federal Court, in San Francisco against Alphabet Inc., bizarre and capricious pre-mature dismissing *Order* filings, which fail to make the Triple Conflicted Conflicted Parties, and Alphabet Inc. plead. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). *Hagans v. Lavine*, 415 U.S. 528 (1974).

Moreover, Woodhouse, at every juncture, used legal filings to request that the District Court take a proverbial moment, and address the inadvertent and arbitrary cacophony of erratas. Third, the *Opening Brief*, also addresses public

1

policy considerations. This matter centers around all of the following: *Counsel Not of Record* and Chairman of Gibson Dunn, incinerating, 9th Circuit Judge Bea, and the former Chairman of Wilson Sonsini, in a hotel, across from Woodhouse's residence, and which Woodhouse witnessed, the Triple Conflicted Parties and Alphabet Inc. running down all of Woodhouse's business customers, and entering Woodhouse's computer systems to accomplish this, the Triple Conflicted Parties, and Alphabet Inc. patently infiltrating California Appellate State record to make Woodhouse a former incarcerated drug convict, when he has never been convicted of any crime, and the felonious taking of depositions of imposters, and providing them to Judge Blumenfeld, in a related matter, in the Central District of California. Eventually, after the filing of the *Complaint* at hand, *Counsel Not of Record*, would also go on to fund the oversee the decapitation of two of Woodhouse's female attorney colleagues, in the hotel across from his residence, and world famous actress, Ms. Kate Bosworth. *Chahal v. Paine Webber Inc.*, 725 F.2d 20 (2d Cir. 1984). This was accomplished providing resources to an ostracized terror cell, within the Seminole tribe. *Decl. Mr. B. Woodhouse*.

Such terrorist funding, in this matter, also came in secession to *Counsel Not of Record* funding Japanese mafia, in conjunction with Meta Platforms, to assassinate Woodhouse. They would continually breach his property with assailant carrying machine guns, sometimes in double digit numbers, prior to the appearance

2

of the Seminole cell. Apparently, the failures of such intimidation schemata, still does not entice the Conflicted Parties to pay restitution for their criminal and terrorist conduct. This District Court also was not up to confounding stereotypes, and rising up, to the task of disciplining these rogue conflicted Trillion dollar entities.

Such a gluttony of witnessed terrorist conduct, in this matter, in addition to the historic plead felonies, and conflicts, raise serious concerns, about the future of the legal profession. *U.S. v. Awan*, 384 F. App'x 9 (2d Cir. 2010). The 2nd Circuit is charged with resisting the coercion of these conflicted Trillion dollar companies, in order to restore basic decency and rudimentary human rights to U.S. democracy. Public policy considerations will not allow for the upholding of terrorism by this elevated Court, and National Security intervention of the most finite nature, would be the only last option, if this *Appellate Panel*, cannot reverse an *Order*, making it legal to engage in terrorism against various Members of the Court. The Conflicted Parties, Alphabet Inc., and the U.S. Government, should also be summarily defaulted, and record punitive damages applied, in this matter for plead felonies, plead conflicts, unadmitted filings, procedural violations, felonious tampering with Court computer systems, and witnessed terrorist events. *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849 (2d Cir. 1995). *Action S.A. v. Marc Rich Co., Inc.*, 951 F.2d 504 (2d Cir. 1991).

3

**STATEMENT WITH RESPECT TO ORAL ARGUMENT**

Woodhouse requests *Oral Argument* to present the issues associated with this Opening Brief. *Decl. Mr. B. Woodhouse.*

**ADDENDUM OF STATUTES**

The relevant Statutes and Rules cited to in this *Opening Brief*, are included at the end of this *Opening Brief*. *Decl. Mr. B. Woodhouse*.

**STATEMENT OF SUBJECT MATTER AND APPELLATE JURSIDICTION**

A *Notice of Appeal* was duly filed in the District Court, within 60 days from the *Final Order*, in this matter, thus the 2nd Circuit has appellate jurisdiction over this matter. 28 U.S. Code Section 1291. The Court made an appealable *Order* in this matter, on Dec. 5th 2023, and a *Notice of Appeal* was filed, on Dec. 6th 2023. Appx. 4. The issue involved: a Federal question, a Constitutional question, and diverse Parties, thus the District Court had proper subject matter jurisdiction. 28 U.S.C. 1331-2.

**STATEMENT OF ISSUES AND STANDARD OF REVIEW**

4

1. Did the Court error in impeaching Woodhouse in the pre-discovery period, and dismissing the claim pre-maturely? This is an error of application of law, and a *De Novo* standard is appropriate. *Hui Lin Huang v. Holder*, 677 F.3d 130 (2d Cir. 2012).

2. Did the Court error in dismissing the claim pre-maturely, when, either, a Federal Question, or, a Constitutional questions arises, and, here, both questions were present? This is also an error in legal application, and a *De Novo* standard is applied. *Michel v. Immigration and Naturalization Serv.*, 206 F.3d 253 (2d Cir. 2000).

3. Did the Court error, in upholding witnessed terrorist acts, and the incineration of 9th Circuit Judge Carlos Bea, in addition to the decapitation of Woodhouse's colleagues, in the interest of public policy? This is an error in applying facts to law, and a *De Novo* standard is appropriate. *U.S. v. Gomes*, 387 F.3d 157 (2d Cir. 2004).

4. Did the Court error, in granting Triple Conflicted Counsel's *Motion* when he: was not admitted to the Court, triple conflicted, had plead felonies with

5

the filing, argued cases that did not stand for his position, and committed

procedural violations?  This is an application, again, of facts to law, and the

*De Novo* standard would also be applied.  *Jones v. Sullivan*, 949 F.2d 57 (2d

Cir. 1991).  Appx. 124.

5.  Did the Court error in failing to take notice of the filed *Letter of Judicial*

*Conflict* issued by Judge Snyder in the Central District of California, in prior

proceedings, after granting Triple Conflicted Counsel's felonious, non

admitted, and not properly captioned injunctive request?  This is an

application of facts to law, thus a *De Novo* review would still be appropriate.

*Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98 (2d

Cir. 1991).  Appx. 21.

## STATEMENT OF THE CASE

The case arises primarily, around a claim for witness intimidation, after the

incineration of 9th Circuit Judge Carlos Bea, and the former Chairman of Wilson

Sonsini, in front of Woodhouse's house, while District, and Appellate Judges were

illegally situated in a hotel, across from Woodhouse's house, with Gibson Dunn

personnel.  Woodhouse also raised the fact that the Conflicted Parties had hacked

the California Appellate system and made Woodhouse a drug convict, when

6

Woodhouse has never been convicted of any crime, as an upstanding Member of the California Bar. Appx. 154. Gibson Dunn's *Counsel Not of Record*, Mr. Ken Doran, working in concert with the Triple Conflicted Counsel, here, ordered the executions. Woodhouse would bring this suit in New York, which has a history of being tough on terrorists, after the 9th Circuit would go on to rule for the Conflicted Parties, despite the Government system intrusion, in a 9th Circuit matter, involving the Parties, despite:

> the executions, additional infanticides, and pleading the most felonies, conflicts, red flagged cases, violations, cases that do not stand for one's position, improper filings, and late filing in U.S. history, and that is not including the fact that Triple Conflicted Counsel entered forty pages of another Counsel's work product unrelated to the case, and sent his *Brief* to the Appellate Court via email. *Appellate Court Record 22-55045. Decl. Mr. B. Woodhouse.*

Woodhouse erroneously assumed that the District Court of New York might be able to overcome the coercion of the conflicted trillion dollar companies.

Conversely, the District Court of New York, with Judge Engelmayer presiding, decided, instead, to fail to make the Conflicted Parties plead to their terrorism, and moved on its own, citing to Supreme Court case law that stood for

7

Woodhouse's position to pre-maturely dismiss the matter.  Appx. 4.  Woodhouse, then, alerted the Court to its improper citation to the Supreme Court case, and also argued that since pre-mature adjudications were illegal that it reconsider its inadvertent error.  Next, Triple Conflicted Counsel, filed a *Motion* for an injunction, despite not being admitted to the Court, and being triple conflicted.  The *Motion* also contained procedural errors, including the felonious attachment of attorney emails.  Appx. 250.  Woodhouse again alerted the Court to the errors, and requested default.  The District Court then bizarrely granted the *Motion* from the conflicted and unadmitted Counsel, upholding terrorism, copying blanket sentences from the unadmitted Counsel's *Motion*.  Appx. 4.

In a final attempt at basic decency, Woodhouse alerted the Court again, through a number of successive *Motions*, that its freedom could be in question, in upholding terrorism.  Woodhouse also alerted the Court that the Conflicted Parties had recently decapitated Woodhouse's colleagues, and one of the most famous actresses in the world, in Ms. Kate Bosworth, as *Counsel Not of Record*, might have mistaken her to be a colleague.  Appx. 39.  These decapitations occurred in the genocide hotel, across from the residence of Woodhouse's family, and Woodhouse witnessed these decapitations, in addition to the incineration.  Additionally, Woodhouse also provided judicial notice that Woodhouse recently discovered, after Triple Conflicted Counsel failed to confer and serve a response

8

that Judge Snyder in the District Court of California, had issued a letter, declaring herself to be conflicted, and her *Order* to be invalid, and provided judicial notice of a Jury verdict, against Alphabet Inc. for unfair business practices. *Decl. Mr. B. Woodhouse.*

The District Court of New York dismissed these *Motions*, all, with one sentence *Orders*. For a District Court to uphold the execution of an Appellate Judge, and to ignore material evidence, such as issued Judges letters, suggests that Triple Conflicted Counsel's false promises of Harvard places, and associate positions at Gibson Dunn, probably were too much for any member of the District Court, to overcome, even in the wake of upholding the worst domestic terrorist attack, in U.S. history. If this is not the case, then the 2nd Circuit, should likely render Judge Engelmayer devoid of capacity, as only mental capitulation, would lead to the upholding of terrorism, and a *Motion* from a conflicted and unadmitted Counsel. Respectfully, if this 2nd Circuit cannot restore basic foundational principles of human rights, and legal decorum to the profession, it might well completely end it, with another coerced ruling.

**SUMMARY OF ARGUMENT**

9

Woodhouse advocates for remand and, also, default, with the application of punitive damages, should be ordered, based on the following four arguments. *Bambu Sales, Inc. v.* First, Supreme Court case law does not allow for pre-mature adjudication of Complaints, which contain, either, a Federal question, or, a Constitutional question. *Hagans v.* This *Complaint*, at issue contains a Federal question, as its speaks to the Federal Statutes, on witness intimidation, and, tampering with private and public records. 18 U.S.C. Section 1512. 18 U.S.C. Section 1030. Separately, and independently, there is a *First Amendment Constitutional* issue around the right to raise terrorist acts, committed by Conflicted Trillion dollar Parties, with the Court, in addition to a right of due process for this Complaint to be heard, which contains serious allegations of interference with Woodhouse's computer systems and his owned Company. *U.S. Constitution.* The District Court cited to *Hagans*, in errata, and prejudicially chose not to amend its *Order*, after being apprised of citing to Supreme Court case law that stands for Woodhouse's position. Moreover, merely, questions of fact, pre-maturely adjudicated, have been reversed by the 2nd Circuit, as being unjust. *Courtenay Communications Corp. v. Hall*, 334 F.3d 210 (2d Cir. 2003).

Second, putridly, Woodhouse had to witness the decapitations of his colleagues, of Ms. Bosworth, a world famous actress, in addition to the incineration of 9th Circuit Judge Carlos Bea, and former Chairman of Wilson

10

Sonsini. Woodhouse witnessed these acts, while they were perpetrated, in the Cliffs Hotel, in Pismo Beach, CA., directly across from the property of Woodhouse's family. *Decl. Mr. B. Woodhouse*. The Appellate Cout cannot impeach Woodhouse's testimony, without discovery on this issue. *U.S. v. Coke*, 339 F.2d 183 (2d Cir. 1964). Such illegal Judicial impeachment is grounds for default, alone, as it prejudices future juries. Even if the District Court, believed Woodhouse to lack capacity to make such declarations, a discovery period and expert testimony, would be required, via operation of law. *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). *Livingston v. Adirondack Beverage Company*, 141 F.3d 434 (2d Cir. 1998).

Third, Triple Conflicted Counsel had his *Motion* granted, after: not being admitted to the Court at filing, after being Triple Conflicted, after feloniously entering privileged attorney communications, committing procedural violations, and citing to a cadre of case law, which stood for Woodhouse's position. *Staehr v. Hartford Financial Services*, 547 F.3d 406 (2d Cir. 2008). Appx. 4, 250. There is no basis for the District Court, to grant such a *Motion*, with such conflicts, and plead felonies in the *Court Record*, and such a movement, demonstrates exceptional inadvertent prejudice. It is even possible that the District Court lacks capacity, as it failed to cite to correct case law, routinely glossed over serious material evidence, with one sentence rulings, and even typed bizarre prejudicial

11

challenges and muddled requests, into a multitude of defective *Orders*, when only a singular Order, was necessary.

Furthermore, Woodhouse offered the District Court judicial notice of Judge Snyder's issued letter of conflict in a previous ruling, between the Parties, and a Jury verdict for unfair business practices from a District Court in San Franciso, against Alphabet Inc. *Decl. Mr. B. Woodhouse*. None of this evidence, however, was even addressed, in any ruling. In fact, Triple Conflicted Counsel failed to respond to Woodhouse's unadjudicated *Motion for Default*. Such an omission, could be construed as an admission of guilt and was grounds for granting of this *Motion*. *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

Fourth, public policy would not allow for a District Court to uphold: the decapitations of defenseless women, the incineration to death of Federal Appellate judges, and, all, in connection with plead felonies and conflicts into the record by a non admitted Triple Conflicted Counsel. *Chahal v.* Such a ruling, incites violence against Federal Judges, and encourages trillion dollar companies to violently execute Plaintiffs. Truthfully, and, as respectfully as possible, this ruling is almost complete mental capitulation, and surpasses cursory coercion.

Woodhouse does not even dare posit what nefarious forces, might be driving such denigration of basic foundational legal principles. This 2nd Circuit, has an

12

ethical duty, to restore basic decorum, and standard to the District Court.

*Minneapolis Etc. Ry. v. Moquin*, 283 U.S. 520 (1931).  Finally, if any of the

following: improper contacts, holdings of the Conflicted Clients stock, felonious

impersonation of Counsel, and sent legal documents, caused the District Court's

consistent erratas, were a driving factor, in this defective ruling, this evidence need

to be ethically disclosed to Woodhouse by any of the following: the U.S.

Attorneys, the Conflicted Parties, and the District Court, as such disclosures have

been requested in the filings.  *Golb v. Attorney Gen. of State*, 870 F.3d 89 (2d Cir.

2017).

## ARGUMENT

I.     **THE SUPREME COURT HAS RULED THAT IT IS ILLEGAL TO PRE-MATURELY DISMISS A MATTER IF IT CONTAINS, EITHER, A FEDERAL ISSUE, OR, CONSTITUTIONAL QUESTION, THIS MATTER CONTAINS BOTH.  THE COURT CITES TO *HAGANS* IN *ERRATA*, AS IT STANDS FOR WOODHOUSE'S POSITION.**

The Supreme Court has summarily ruled that pre-mature dismissals are to be

remanded, and are illegal, should any Complaint, contain, either, a Federal issue,

13

or, Constitutional question. *Hagans v.* In this matter, Woodhouse's allegations and witnessed declarations, speak directly to Federal privacy statutes, which prohibit tampering with, both, Woodhouse's, and the Government's systems. 18 U.S.C. Section 1030. *U.S. v. Reich*, 479 F.3d 179 (2d Cir. 2007). Additionally, Woodhouse also raises a Federal witness tampering statute, in his *Complaint*, which is germane to the witnessed terrorist conduct that was financed by Gibson Dunn's *Counsel Not of Record*, and the Conflicted Parties. 18 U.S.C. Section 1512. Appx. 154-221. In fact, such conduct continues in the present, in addition to *Counsel Not of Record*, yelling slurs from the genocide hotel into Woodhouse's residence during the late evening and early morning hours.

Moreover, Woodhouse also presciently fandangos with Constitutional issues, in raising issues of *First Amendment* free speech, in bringing a civil matter to District Court, while contravening the witnessed terrorism, and also in having his electronic filing privileges capriciously removed by the Central District Court in California, as a result of alleged coercion, by Triple Conflicted Parties. Independently, there is also due process issues, in Woodhouse being able to gain fair hearings. *U.S. Constitution*. Once, a denial of due process, after a District Court, in California, refused to compel the disclosure of binders of depositions of imposters, despite filed requests, and requests in the *Court Record*. *Combs v. Rockwell Intern Corp. v.*, 927 F.2d 486 (9th Cir. 1991). Now again, a denial of due

14

process, as Woodhouse is unable to be afforded even a hearing for Constitutional due process purposes, in this New York based District Court, based on *Counsel Not of Record's* witnessed terrorist acts.

Specifically, the funding of the heinous decapitation of Woodhouse's colleagues, and world renown actress, Ms. Kate Bosworth, in a hotel parking lot, across for his family's property. Further, the Triple Conflicted Parties, were also not even required to plead to the execution of 9th Circuit Judge Bea, witnessed by Woodhouse. Such an inadvertent, and bizarre, additional denial of due process also lends grounds for remand, in the interest of justice. *Satchell v. Dilworth,* 45 F.2d 781 (2d Cir. 1984). Additionally, an independent Constitutional due process basis, could also be found, in the Central District Court's retaliatory unconstitutional restriction on Woodhouse's electronic filing privileges, which gave rise to the 9th Circuit matter, in which 9th Circuit, Judge Bea, was executed. *Ringgold-Lockhart v. Cnty. of L.A.*, 552 F. App'x 648 (9th Cir. 2014). As it pertains to a Constitutional violation, this Court is also empowered, should it grant, either, remand, or, default, and award of punitive damages, to order Woodhouse's electronic privileges be restored to all U.S. District Courts, where Woodhouse is admitted.

In contrast, the 2nd Circuit has carved one very narrow exception to the rule of illegality for pre-mature dismissals, and that is for violations of the Statute of

15

Limitations on claims. *Pino v. Ryan*, 49 F.3d 51 (2d Cir. 1995). There is no such argument, in this matter, and these claims have been filed in a timely manner, actually while the witness intimidation and domestic terrorist acts, are still ongoing. Woodhouse has frequently woken up to the stench of burning humans, as the Seminole cell, funded by *Counsel Not of Record*, continues to consume victims, and engage in acts, which are unspeakable, and so atavistic that even the most barbaric Phillistine, would be incredulous.

Further, the 2nd Circuit, itself, has also, in support of Woodhouse's position, celestially censured Courts, should this elevated Court, detect, even the most nominal retaliatory motivation, as a basis for the District Court's illegal pre-mature ruling. *Montero v. Travis*, 171 F.3d 757 (2d Cir. 1999). Moreover, this Court has found pre-mature adjudications of just material questions of fact, without such Constitutional and Federal question controversies, still to be reversible error. *Courtenay Communications Corp. v.* Why would this Court prejudicially overturn itself, and the Supreme Court, simply to cloak the plead felonies, and conflicts, and witnessed terrorist acts, of these behemoth conflicted Parties, in this matter?

Furthermore, Triple Conflicted Counsel was not only not required to plead in this matter, but also offers no case law, to suggest that the Supreme Court's ruling on illegal pre-mature rulings, should be overturned. In fact, Triple Conflicted Counsel's defective *Motion*, while being unadmitted at the time of the

16

filing to the District Court, primarily only focuses on the inconvenience of his

trillion dollar Clients having to answer for: the alleged stealing of Customer orders,

and running down Woodhouse's Customers, the hacking of Government records,

to falsely make Woodhouse a convicted drug felon, and for senselessly funding

Japanese mafia, and Seminole tribal terror cells, respectively in order to decapitate

defenseless women, and require Woodhouse to stave off armed attackers, almost

on a nightly basis. Perhaps, this 2nd Circuit could send a different message, one

which will enjoin such witnessed terrorist acts, plead felonies, and plead conflicts,

in the future.

 

 

**II. WOODHOUSE WITNESSED THE TERRORIST EVENTS FUNDED BY TRIPLE CONFLICTED COUNSEL, AND HE CANNOT LEGALLY BE, EITHER, IMPEACHED, OR, HAVE CAPACITY CHALLENGED, WITHOUT A DISCOVERY PERIOD BEING ORDERED.**

Woodhouse, in this instance, is: a member of the California Bar, a service

award winner, law school scholarship award winner, and former representative of

the United States on the professional tennis tour, his declaration, as to witnessed a

multitude of terrorist events, which occurred across from his family's residence,

should hold as much weight with the Court, as testimony presented from any Party. The District Court does not have the legal right to impeach Woodhouse, without ordering a discovery period, and making an investigation into the facts of the matter. *Federal Rules of Evidence 403*. *United States v. Auen*, 846 F.2d 872 (2d Cir. 1988). It must take all facts as true when considering, a *Motion to Dismiss*, and in this case, there was never any such *Motion* filed, as the Court bizarrely chose to prejudicially, illegally move on its own, and cite erroneously to Supreme Court case law, as such a basis. *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993).

Woodhouse had not had any contact with the District Court, prior to the rulings, other than the duly filed *Complaint*, and the 2nd Circuit, would be opening an additional pandora's box, in allowing Judges and Clerks to make evidentiary findings solely based on emotions from reading the *Complaint. Decl. Mr. B. Woodhouse*. While it is true that the witnessed events, in this matter, are preciously unsettling, embarrassing for our profession, and situated in the realm of terrorism, such injustices, cannot be cured, by simply prejudicially pretending that they are too difficult to believe. What separates the United States, from other countries, and is the cornerstone of democracy, is its commitment to free speech, and its willingness to hear criticism of the U.S. Government, and for the U.S. Government Leadership to appropriately respond to that criticism.

18

Furthermore, Triple Conflicted Counsel should recuse themselves, as they are also disqualified in these matters, as potential witnesses, in addition to being advocates concurrently for the three conflicted Parties. *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984). Such a conflict also holds true for Alphabet Inc.'s Counsel. Additionally, default is proper, on the Court's pre-mature impeachment, and this disqualification, as the publicly filed impeachment, has prejudiced a future jury. *HBE Leasing Corp. v. Frank*, 22 F.3d 41 (2d Cir. 1994). My Client will not be able to gain an impartial requested jury trial.

Moreover, even if the District Court, was to incorrectly, conceive Woodhouse to lack capacity, and for psychological issues, to cast doubt on the veracity of his testimony, it would still need expert witnesses, to attest to that fact, and the matter, would have to be transferred into a discovery period under operation of law. *Livingston v*. The District Court has not ordered any such discovery, and cannot arbitrarily dismiss Woodhouse's testimony, based on inadvertent prejudices. *United States v. Auen*. There is also ample and patent evidence, ranging from the pre-mature adjudication, to the multitude of one sentence *Motion Orders*, on serious material evidence. Such material evidence, in this instance, included a *Conflict Letter* issued by the Central District Court Judge of a self-discovered conflict, as to Judicial conflict, and a *Jury Verdict* from the

19

Northern District of California, declaring Alphabet Inc., to have engaged in unfair business practices.

### III. THE COURT SHOULD HAVE DEFAULTED THE CONFLICTED PARTIES, AND ALPHABEIT INC., INDEPENDENTLY, AND UNDER A TOTALITY OF CIRCUMSTANCES FOR: A TRIPLE CONFLICT, FOR FILING A MOTION WHEN NOT ADMITTED TO THE COURT, COMMITTING VIOLATIONS, PATENTLY HACKING THE CALIFORNIA APPELLATE SYSTEM, AND ENGAGING IN WITNESSED TERRORIST ACTS.

Woodhouse moves the 2nd Circuit to default the Parties, under the totality of plead criminal acts, violations, and witnessed terrorist events. *Bambu Sales Inc. v.* First, Triple Conflicted Counsel is concurrently representing three Parties, and represented Alphabet Inc. in a previous matter, which creates a quadra conflict in this matter. *In Re American Airlines v.*, 972 F.2d 605 (5th Cir. 1992). Second, Mr. Van Schwing, was not admitted to the Second Circuit, and also was not Ms. Linsley, when Mr. Van Schwing signed, and filed his initial *Motion* for an injunction. Eventually, Ms. Linsley's admission would show up, but not at the time of filing. Third, Triple Conflicted Counsel failed to properly lodge his

20

*Proposed Order*, argued cases that do not stand for his position, and did not properly caption his *Motion* to be an actual Motion that Federal Courts adjudicate.

Fourth, Triple Conflicted Counsel feloniously attached privileged attorney emails from Woodhouse, and entered them into the public record. Woodhouse has warned Triple Conflicted Counsel about such felonious practices, in related prior cases, and apparently, this aspect of takings, has still not registered. 18 U.S.C. Section 1030. *Federal Rules of Evidence 408*. Appx. 250. This act, alone, could be grounds for default. *Televideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987). Fifth, Triple Conflicted Counsel patently has entered California Appellate systems to make Woodhouse a convicted drug felon, when he has never been convicted of any non traffic related crime. The 2nd Circuit can take judicial notice of this *California Court Appellate Record*.

Sixth, Alphabet Inc., also fails to include a *Memorandum of Points and Authorities*, in its curiously similar *Motion* filing, in an additional procedural violation. Appx. 250. All of these plead felonies, conflicts, and violations, taken in totality, with the decapitations of Woodhouse's colleague, which he witnessed, in addition to the witnessed incineration of 9th Circuit Judge Carlos Bea, and the former Chairman of Wilson Sonsini, are firm reasons for this 2nd Circuit to default the Conflicted Parties, Alphabet Inc., and the U.S. Government, and apply punitive damages, which truly enjoin such future conduct. Triple Conflicted Counsel

21

associates with an International Firm, which has an Office in New York, and his

Clients, are trillionaires, there is no plausible explanation for why an admitted

Counsel, could not have filed his *Motion*, and why he must represent his own Firm,

and two other Parties concurrently, in this matter?

Additionally, there is no promulgation of cogent legal sagacity, in the

District Court's rulings, on why Judge Snyder's self reported *Conflict Letter*, and

Alphabet Inc.'s recent finding to have engaged in unfair business practices by a

Federal Court in San Francisco, is not apropos to this proceeding. *Caperton v.*

Woodhouse properly asserted these two pieces of newly discovered for the first

time material evidence, in *Motion* filings, and these undisputable pieces of

evidence in *Federal Cout Records*, alone, are grounds for this matter, to be at the

very least, transferred into a discovery period. The Court's inability to, either,

address, or, acknowledge crucial material evidence, which is part of Court records,

suggests that the District Court has fallen to inadvertent, either, coercion, or,

bizarre prejudice.

Further, Woodhouse cannot send resolution offers to Triple Conflicted

Counsel, without all three Conflicted Parties seeing the offer, as Triple Conflicted

Counsel represents all of them at once. It is also difficult to keep, both, resolution

offers, and attorney work product confidential, when Alphabet Inc.'s Counsel is

illegally cohabitating with Triple Conflicted Counsel, in the genocide hotel, in

Pismo Beach, CA. The felonious acts, in this matter, are either, plead, or, patent, not just alleged. The Conflicted Parties, and Alphabet Inc. routinely eavesdrop on Woodhouse's calls to process servers, and prospective Customers, and sometimes *Counsel Not of Record*, even participates in the call, with the ranting of slurs, from across the street.

    As stated, in the *Summary of Argument*, if any of these items: improper contacts, holdings of the Conflicted Clients stock, felonious impersonation of Counsel, and sent legal documents, caused the District Court's consistent erratas, were proximate causes for this defective ruling, this evidence need to be ethically disclosed to Woodhouse by any of the following: the U.S. Attorneys, the Conflicted Parties, and the District Court, as such disclosures have now also been requested in this *Opening Brief*. *Golb v*. Woodhouse never mailed, faxed or emailed the District Court any items. *Decl. Mr. B. Woodhouse*. It is well within the interest of justice, in this matter for the 2nd Circuit to hold Triple Conflicted Counsel, and Alphabet Inc.'s Counsel responsible for their plead crimes, conflicts, and violations, in addition to ending the funding of terrorism, via a resolute default, and award of respective punitive damages, which would be historic in level.

**IV.    PUBLIC POLICY DOES NOT ALLOW THE DISTRICT COURT TO UPHOLD THE INCINERATION OF A 9TH CIRCUIT JUDGE, THE DECAPITATION OF WOODHOUSE'S COLLEAGUES, AND TO IGNORE A JUDICIAL CONFLICT DECLARED BY THE DISTRICT JUDGE HERSELF.  SUCH A JUDICIAL RULING IS PATENTLY, EITHER, INADVERTENT, OR, ACTUAL, COERCION.**

Woodhouse has witnessed over a thirty-six month period, the single worst domestic terrorist attack, in U.S. history, perpetrated by *Counsel Not of Record*, the Triple Conflicted Parties, and Alphabet Inc.  What started as inadvertent and bizarre patent collusion, by the illegal cohabitation in a beach hotel by U.S. Attorneys, Counsels of Record, *Counsel Not of Record*, and presiding Federal and Appellate Judges, morphed into the worst domestic terrorist scenario ever, with six California State police being executed at *Counsel Not of Record's* request, thousands executed, my colleagues decapitated, and 9th Circuit Judge Bea, along with a Wilson Sonsini Chairman, being immolated to death.  *Linde v. Arab Bank*, PLC, 882 F.3d 314 (2d Cir. 2018).  This terrorist event likely surpasses 9/11 in severity, based on, both, death count, and threat to our free society.  Further, this

24

terrorist event, also involved terror cells engaging, in cannibalism within the genocide hotel, in Pismo Beach, CA., after Judge Bea's incineration, and even the use of child soldiers, with the Seminole Cell arming children, as young as eleven and twelve, and instructing them to parade the decapitated head of my colleague, around Woodhouse's neighborhood. 18 U.S.C. Section 2442. Such roisterous behavior is ironic, considering, Fmr. President Bush enacted this referenced Child Soldier Statute. The whole world was watching, with various foreign intelligence agencies, accessing the genocide hotel, this legal event was beyond a mockery, under anyone's perspective on human rights.

In many respects, the neolithic like nature, and consistency of executions within the genocide event, is difficult to qualify. What is even more difficult to grapple with, is the audacity of *Counsel Not of Record*, and Triple Conflicted Counsel, to continue to, both, defend in the Courts, and to fail to leave the genocide hotel, and return to their respective homes, after Woodhouse made these witnessed terrorist events, a matter of public record. *U.S. v. Hir,* 517 F.3d 1081 (9th Cir. 2008). While the venerable 2nd Circuit might be the only empowered Party to make meaningful rulings, on Court decorum and capacity, it is obvious that the Conflicted Parties, and *Counsel Not of Record*, do not believe that, either, the Federal Courts, or, the U.S. Government Leadership, have the volition and moral decency to reign in their abject terrorist conduct.

25

If reports that *Counsel Not of Record* also executed Former President George

H.W. Bush, in the genocide hotel, are true, this legal event, would now border, on

a full scale coup d'etat, against the U.S. Government by these conflicted Trillion

dollar companies. While Woodhouse did not witness this specific execution, he

can also attest that Alphabet Inc., *Counsel Not of Record*, and 9th Circuit Judge

Miller, all, still cohabitating in the genocide hotel together. Frequently, they chant

slurs together at Woodhouse, and it is obvious to Woodhouse that potentially these

legal actors do not have the mental health required, to cognitively process that they

are participatory, in the worst domestic terrorist event, in U.S. history. The 2nd

Circuit is charged with moving on its own, to assist these actors, upon notice of

this filing. *Decl. Mr. B. Woodhouse*. It is these legal actors best chance at life,

before potential National Security intervention. Such visually patent coercive

conduct, would, also, be grounds alone for default. *Bambu Sales Inc. v.*

By failing to restrict *Counsel Not of Record's* access to money, the U.S.

Government likely allowed more executions and decapitations to occur. Any

publicly filed intervening action from the Central District of California, and New

York District Court, likely, would have curtailed some murders of the innocent, in

these matters. Woodhouse reported the conduct consistently, and unabated to the

U.S. Attorneys of record, in writing, in the pending 9th Circuit matters.

Woodhouse, also, in writing, initially, recommended that the U.S. Attorneys

contact the A.T.F. in addition to the F.B.I. in order to obtain the illegal military grade box and ball machine like guns, which were being used, in the hotel, to execute unarmed individuals.

Further, the F.B.I. were present, in the hotel, and Woodhouse could have saved his colleagues lives, and that of Ms. Bosworth's, with potential extractions by Woodhouse with U.S. Government permission, if the U.S. Attorneys had alerted Woodhouse that they were being detained by the Seminole cell in the hotel. It should also should be noted that *Counsel Not of Record* funded Japanese American Organized crime, in facilitation with Meta Platforms, with $50MM U.S. for an assassination of Woodhouse, which resulted in Woodhouse enduring two months worth of assailants, on his property with machine guns. This onslaught, also, included one, event, which featured joint participation from Yakuza, and military special force type contractors, in a Tet like offensive. Its failure was a clue to the Federal Courts, the Conflicted Parties, and Alphabet Inc.

After surviving over six hundred assassination attempts, there has been no conferral from, either, Triple Conflicted Counsel, or, Alphabet Inc.'s Counsel. The Leaders of these trillion dollar companies actually believe that they will walk off into the sunset, without paying any restitution, despite this number of assassination attempts, and despite Tripe Conflicted Counsel, and Alphabet Inc., pleading the most: felonies, conflicts, red flagged cases, violations, non admitted filings, and

27

cases that stand for Woodhouse's position in U.S. legal history, across a variety of matters respectively. Such a belief is not well founded, and not consistent with real world protocols, within the U.S. National Security structure. This venerable Appellate Court is charged with saving the lives of these families, through resisting coercion, and enforcing the genocide, and punitive damages, such that the Conflicted Parties, and Alphabet Inc. can have a real world chance at proceeding.

Furthermore, public policy considerations, should not allow this elevated Appellate Court to incentivize large companies to execute Appellate Judges, and to leverage violence, against Plaintiffs, in order to gain legal advantage, via the upholding of the defective *Orders*, in this case. This Appellate Court has an affirmative ethical duty to make rulings that protect fellow Judges, and Counselors. Moreover, the 2nd Circuit has also ruled that *Pro Se's* Appellants, can represent their own interests before the 2nd Circuit, and the Appellate Court cannot prejudice non admitted Parties, if they are proceeding in *Pro Se* form, under any circumstance. *Leftridge v. Connecticut State Trooper Officer*, 640 F.3d 62 (2d Cir. 2011). There is no basis for inadvertent prejudice, in this matter. The Appellate Court must stand up to the Conflicted Trillionaires, who are attempting to bully, and in some instances terrorize, anything that challenges their respective: inherently coercive nature, contrived pricing schemata, unfair business practices, and illegal surveillance, and complete contempt for all types of Federal Courts of

28

law.  As Woodhouse has noted, in other legal filings, Dr. Martin King, once said, "an injustice anywhere, is an injustice everywhere," these words ring true, in this instance.  *Decl. Mr. B. Woodhouse*.

## CONCLUSION

In conclusion, the Appellate Court should default, Nike Inc., Meta Platforms Inc., Alphabet Inc., and the U.S. Government, each respectively, and apply record punitive damages for: plead felonies, a plead triple conflict, a non admitted filing, tampering with *California Appellate Court Records*, non admitted filings, unethical conduct, in failing to disclose a Judicial conflict, procedural violations, and engaging in, and funding, witnessed terrorist events.


/s/Benjamin Woodhouse

Mr. Benjamin Woodhouse
2975 Bayview Drive
Pismo Beach, CA. 93449
805 709 1995
*Pro Se Appellant*

## CERTIFICATE OF COMPLIANCE

I certify, as the Appellant *Pro Se,* that this *Opening Brief*, in this matter, *23-7973*, contains words, 6,045 words excluding the items exempted by F.R.A.P. 32(f).  The *Brief's* type size and typeface comply with F.R.A.P. 32(a)(5)(6).  I certify that this *Brief*, complies with the word limit of the U.S. 2nd Cir. and F.R.A.P. 32(a)(7).

Date: Jan. 20th 2023                                   /s/Benjamin Woodhouse

                                                                Mr. Benjamin Woodhouse

                                                                *Pro Se Appellant*

# CERTIFICATE OF SERVICE

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

**2nd Cir. Case Number(s)**   23-7973

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[ X ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[X ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days,                 or,having obtained prior consent, by email to the following unregistered  case participants *(list each name and mailing/email address)*:

> Ms. Linsley, Gibson Dunn, One Embarcadero Center Suite 2600, San Francisco, CA 94111, Ms. Amy Candido, Wilson Sonsini, 1 Market St, Unit 3300, San Francisco, CA 94105, Ms. Sarah Clemens 5901 W. Century Blvd. Los Angeles, CA. 90045, A.G. Bonta, 1300 I St., Sacramento, CA. 95814, Mr. Benjamin Torrance, United States Attorney's Office One St. Andrew's Plaza New York, NY 10007

**Description of Document(s)** *(required for all documents)*:

> *Appellant, Woodhouse's Pro Se Opening Brief*

**Signature**   /s/Benjamin Woodhouse          **Date:** 01/20/24

# ADDENDUM

Statutes:

18 U.S.C. Section 1030..............................ADD 1

18 U.S.C. Section 1512..............................ADD 8

18 U.S.C. Section 2442.............................ADD 11

28 U.S. Code Section 1291.......................ADD 12

28 U.S.C. 1331-2......................................ADD 13


Rules:

*Federal Rules of Evidence 403*.................ADD 18

*Federal Rules of Evidence 408*.................ADD 20

## 18 U.S.C. Section 1030

(a) Whoever—

(1)

having knowingly accessed a computer without authorization or exceeding authorized access, and by means of such conduct having obtained information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph y. of section 11 of the Atomic Energy Act of 1954, with reason to believe that such information so obtained could be used to the injury of the United States, or to the advantage of any foreign nation willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it;

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

(A)

information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) [1] of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

(B)

information from any department or agency of the United States; or

(C)

information from any protected computer;

(3)

intentionally, without authorization to access any nonpublic computer of a department or agency of the United States, accesses such a computer of that department or agency that is exclusively for the use of the Government of the United States or, in the case of a computer not exclusively for such use, is used by or for the Government of the United States and such conduct affects that use by or for the Government of the United States;

(4)

knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

(5)

(A)

knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B)

intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C)

intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.[2]

ADD 1

(6) knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if—

(A)

such trafficking affects interstate or foreign commerce; or

(B)

such computer is used by or for the Government of the United States; [3]

(7) with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any—

(A)

threat to cause damage to a protected computer;

(B)

threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or

(C)

demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion;

shall be punished as provided in subsection (c) of this section.

(b)

Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

(c) The punishment for an offense under subsection (a) or (b) of this section is—

(1)

(A)

a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(1) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

(B)

a fine under this title or imprisonment for not more than twenty years, or both, in the case of an offense under subsection (a)(1) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(2)

(A)

except as provided in subparagraph (B), a fine under this title or imprisonment for not more than one year, or both, in the case of an offense under subsection (a)(2), (a)(3), or (a)(6) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(B) a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(2), or an attempt to commit an offense punishable under this subparagraph, if—

(i)

the offense was committed for purposes of commercial advantage or private financial gain;

(ii)

the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or

ADD 2

(iii)

the value of the information obtained exceeds $5,000; and

(C)

a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(2), (a)(3) or (a)(6) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(3)

(A)

a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4) or (a)(7) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

(B)

a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4),[4] or (a)(7) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

(4)

(A) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of—

(i) an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)—

(I)

loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(II)

the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(III)

physical injury to any person;

(IV)

a threat to public health or safety;

(V)

damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

(VI)

damage affecting 10 or more protected computers during any 1-year period; or

(ii)

an attempt to commit an offense punishable under this subparagraph;

(B) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 10 years, or both, in the case of—

(i)

ADD 3

an offense under subsection (a)(5)(A), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused) a harm provided in subclauses (I) through (VI) of subparagraph (A)(i); or

(ii)

an attempt to commit an offense punishable under this subparagraph;

(C) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 20 years, or both, in the case of—

(i)

an offense or an attempt to commit an offense under subparagraphs (A) or (B) of subsection (a)(5) that occurs after a conviction for another offense under this section; or

(ii)

an attempt to commit an offense punishable under this subparagraph;

(D) a fine under this title, imprisonment for not more than 10 years, or both, in the case of—

(i)

an offense or an attempt to commit an offense under subsection (a)(5)(C) that occurs after a conviction for another offense under this section; or

(ii)

an attempt to commit an offense punishable under this subparagraph;

(E)

if the offender attempts to cause or knowingly or recklessly causes serious bodily injury from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for not more than 20 years, or both;

(F)

if the offender attempts to cause or knowingly or recklessly causes death from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for any term of years or for life, or both; or

(G) a fine under this title, imprisonment for not more than 1 year, or both, for—

(i)

any other offense under subsection (a)(5); or

(ii)

an attempt to commit an offense punishable under this subparagraph.

(d)

(1)

The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section.

(2)

The Federal Bureau of Investigation shall have primary authority to investigate offenses under subsection (a)(1) for any cases involving espionage, foreign counterintelligence, information protected against unauthorized disclosure for reasons of national defense or foreign relations, or Restricted Data (as that term is defined in section 11y of the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)), except for offenses affecting the duties of the United States Secret Service pursuant to section 3056(a) of this title.

(3)

Such authority shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.

ADD 4

(e) As used in this section—

(1)

the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

(2) the term "protected computer" means a computer—

(A)

exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government;

(B)

which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States; or

(C) that—

(i)

is part of a voting system; and

(ii)

(I)

is used for the management, support, or administration of a Federal election; or

(II)

has moved in or otherwise affects interstate or foreign commerce;

(3)

the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession or territory of the United States;

(4) the term "financial institution" means—

(A)

an institution, with deposits insured by the Federal Deposit Insurance Corporation;

(B)

the Federal Reserve or a member of the Federal Reserve including any Federal Reserve Bank;

(C)

a credit union with accounts insured by the National Credit Union Administration;

(D)

a member of the Federal home loan bank system and any home loan bank;

(E)

any institution of the Farm Credit System under the Farm Credit Act of 1971;

(F)

a broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934;

(G)

the Securities Investor Protection Corporation;

(H)

a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); and

(I)

an organization operating under section 25 or section 25(a) [1] of the Federal Reserve Act;

(5)

the term "financial record" means information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution;

(6)

the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;

(7)

the term "department of the United States" means the legislative or judicial branch of the Government or one of the executive departments enumerated in section 101 of title 5;

(8)

the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

(9)

the term "government entity" includes the Government of the United States, any State or political subdivision of the United States, any foreign country, and any state, province, municipality, or other political subdivision of a foreign country;

(10)

the term "conviction" shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

(11)

the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service;

(12)

the term "person" means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity;

(13)

the term "Federal election" means any election (as defined in section 301(1) of the Federal Election Campaign Act of 1971 (52 U.S.C. 30101(1))) for Federal office (as defined in section 301(3) of the Federal Election Campaign Act of 1971 (52 U.S.C. 30101(3))); and

(14)

the term "voting system" has the meaning given the term in section 301(b) of the Help America Vote Act of 2002 (52 U.S.C. 21081(b)).

(f)

This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

(g)

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses [5] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

(h)

The Attorney General and the Secretary of the Treasury shall report to the Congress annually, during the first 3 years following the date of the enactment of this subsection, concerning investigations and prosecutions under subsection (a)(5).

(i)

(1) The court, in imposing sentence on any person convicted of a violation of this section, or convicted of conspiracy to violate this section, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person forfeit to the United States—

(A)

such person's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation; and

(B)

any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

(2)

The criminal forfeiture of property under this subsection, any seizure and disposition thereof, and any judicial proceeding in relation thereto, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except subsection (d) of that section.

(j) For purposes of subsection (i), the following shall be subject to forfeiture to the United States and no property right shall exist in them:

(1)

Any personal property used or intended to be used to commit or to facilitate the commission of any violation of this section, or a conspiracy to violate this section.

(2)

Any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of this section, or a conspiracy to violate this section [6]

ADD 7

## 18 U.S.C. Section 1512

(a)

(1) Whoever kills or attempts to kill another person, with intent to—

(A)

prevent the attendance or testimony of any person in an official proceeding;

(B)

prevent the production of a record, document, or other object, in an official proceeding; or

(C)

prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

(2) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—

(A)

influence, delay, or prevent the testimony of any person in an official proceeding;

(B) cause or induce any person to—

(i)

withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(ii)

alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

(iii)

evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(iv)

be absent from an official proceeding to which that person has been summoned by legal process; or

(C)

hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

(3) The punishment for an offense under this subsection is—

(A)

in the case of a killing, the punishment provided in sections 1111 and 1112;

(B) in the case of—

(i)

an attempt to murder; or

(ii)

the use or attempted use of physical force against any person;

imprisonment for not more than 30 years; and

(C)

in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.

ADD 8

(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

(e) In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted

solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

(f) For the purposes of this section—

(1)

an official proceeding need not be pending or about to be instituted at the time of the offense; and

(2)

the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

(g) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance—

(1)

that the official proceeding before a judge, court, magistrate judge, grand jury, or government agency is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

(2)

that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

(h)

There is extraterritorial Federal jurisdiction over an offense under this section.

(i)

A prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred.

(j)

If the offense under this section occurs in connection with a trial of a criminal case, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

(k)

Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

ADD 10

## 18 U.S.C. Section 2442

(a) Offense.—Whoever knowingly—

(1)

recruits, enlists, or conscripts a person to serve while such person is under 15 years of age in an armed force or group; or

(2)

uses a person under 15 years of age to participate actively in hostilities;

knowing such person is under 15 years of age, shall be punished as provided in subsection (b).

(b) Penalty.—

Whoever violates, or attempts or conspires to violate, subsection (a) shall be fined under this title or imprisoned not more than 20 years, or both and, if death of any person results, shall be fined under this title and imprisoned for any term of years or for life.

(c) Jurisdiction.—There is jurisdiction over an offense described in subsection (a), and any attempt or conspiracy to commit such offense, if—

(1)

the alleged offender is a national of the United States (as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22))) or an alien lawfully admitted for permanent residence in the United States (as defined in section 101(a)(20) of such Act (8 U.S.C. 1101(a)(20)); [1]

(2)

the alleged offender is a stateless person whose habitual residence is in the United States;

(3)

the alleged offender is present in the United States, irrespective of the nationality of the alleged offender; or

(4)

the offense occurs in whole or in part within the United States.

(d) Definitions.—In this section:

(1) Participate actively in hostilities.—The term "participate actively in hostilities" means taking part in—

(A)

combat or military activities related to combat, including sabotage and serving as a decoy, a courier, or at a military checkpoint; or

(B)

direct support functions related to combat, including transporting supplies or providing other services.

(2) Armed force or group.—

The term "armed force or group" means any army, militia, or other military organization, whether or not it is state-sponsored, excluding any group assembled solely for nonviolent political association.

28 U.S. Code Section 1291

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C. Section 1332

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

(1)

citizens of different States;

(2)

citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

(3)

citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4)

a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

(b)

Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

(c) For the purposes of this section and section 1441 of this title—

(1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of—

(A)

every State and foreign state of which the insured is a citizen;

(B)

every State and foreign state by which the insurer has been incorporated; and

(C)

the State or foreign state where the insurer has its principal place of business; and

(2)

the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

(d)

(1) In this subsection—

(A)

the term "class" means all of the class members in a class action;

(B)

ADD 13

the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

(C)

the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

(D)

the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—

(A)

any member of a class of plaintiffs is a citizen of a State different from any defendant;

(B)

any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(C)

any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of—

(A)

whether the claims asserted involve matters of national or interstate interest;

(B)

whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

(C)

whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

(D)

whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

(E)

whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

(F)

whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

(4) A district court shall decline to exercise jurisdiction under paragraph (2)—

(A)

(i) over a class action in which—

(I)

greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

(II) at least 1 defendant is a defendant—

(aa)

from whom significant relief is sought by members of the plaintiff class;

(bb)

whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc)

who is a citizen of the State in which the action was originally filed; and

(III)

principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii)

during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

(B)

two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

(5) Paragraphs (2) through (4) shall not apply to any class action in which—

(A)

the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

(B)

the number of members of all proposed plaintiff classes in the aggregate is less than 100.

(6)

In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

(7)

Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

(8)

This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

(9) Paragraph (2) shall not apply to any class action that solely involves a claim—

(A)

concerning a covered security as defined under 16(f)(3) [1] of the Securities Act of 1933 (15 U.S.C. 78p(f)(3) [2]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

ADD 15

(B)

that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

(C)

that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

(10)

For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

(11)

(A)

For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

(B)

(i)

As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

(ii) As used in subparagraph (A), the term "mass action" shall not include any civil action in which—

(I)

all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

(II)

the claims are joined upon motion of a defendant;

(III)

all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

(IV)

the claims have been consolidated or coordinated solely for pretrial proceedings.

(C)

(i)

Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

(ii) This subparagraph will not apply—

(I)

to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

(II)

ADD 16

if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

(D)

The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

(e)

The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

ADD 17

# Federal Rules of Evidence 403

**Primary tabs**

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

**Notes**

(Pub. L. 93–595, §1, Jan. 2, 1975, 88 Stat. 1932; Apr. 26, 2011, eff. Dec. 1, 2011.)

Notes of Advisory Committee on Proposed Rules

The case law recognizes that certain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission. Slough, Relevancy Unraveled, 5 Kan. L. Rev. 1, 12–15 (1956); Trautman, Logical or Legal Relevancy—A Conflict in Theory, 5 Van. L. Rev. 385, 392 (1952); McCormick §152, pp. 319–321. The rules which follow in this Article are concrete applications evolved for particular situations. However, they reflect the policies underlying the present rule, which is designed as a guide for the handling of situations for which no specific rules have been formulated.

Exclusion for risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time, all find ample support in the authorities. "Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

The rule does not enumerate surprise as a ground for exclusion, in this respect following Wigmore's view of the common law. 6 Wigmore §1849. Cf. McCormick §152, p. 320, n. 29, listing unfair surprise as a ground for exclusion but stating that it is usually "coupled with the danger of prejudice and confusion of issues." While Uniform Rule 45 incorporates surprise as a ground and is followed in Kansas Code of Civil Procedure §60–445, surprise is not included in California Evidence Code §352 or New Jersey Rule 4, though both the latter otherwise substantially embody Uniform Rule 45. While it can scarcely be doubted that claims of unfair surprise

ADD 18

may still be justified despite procedural requirements of notice and instrumentalities of discovery, the granting of a continuance is a more appropriate remedy than exclusion of the evidence. Tentative Recommendation and a Study Relating to the Uniform Rules of Evidence (Art. VI. Extrinsic Policies Affecting Admissibility), Cal. Law Revision Comm'n, Rep., Rec. & Studies, 612 (1964). Moreover, the impact of a rule excluding evidence on the ground of surprise would be difficult to estimate.

In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction. See Rule 106 [now 105] and Advisory Committee's Note thereunder. The availability of other means of proof may also be an appropriate factor.

Committee Notes on Rules—2011 Amendment

The language of Rule 403 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

‹ Rule 402. General Admissibility of Relevant Evidence up Rule 404. Character Evidence; Other Crimes, Wrongs, or Acts ›

# Federal Rules 408

**(a) Prohibited Uses.** Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

**(1)** furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and

**(2)** conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

**(b) Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

**Notes**

(Pub. L. 93–595, §1, Jan. 2, 1975, 88 Stat. 1933; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 26, 2011, eff. Dec. 1, 2011.)

Notes of Advisory Committee on Proposed Rules

As a matter of general agreement, evidence of an offer-to compromise a claim is not receivable in evidence as an admission of, as the case may be, the validity or invalidity of the claim. As with evidence of subsequent remedial measures, dealt with in Rule 407, exclusion may be based on two grounds. (1) The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position. The validity of this position will vary as the amount of the offer varies in relation to the size of the claim and may also be influenced by other circumstances. (2) a more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes. McCormick §§76, 251. While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto. This latter situation will not, of course, ordinarily occur except when a party to the present litigation has compromised with a third person.

The same policy underlies the provision of Rule 68 of the Federal Rules of Civil Procedure that evidence of an unaccepted offer of judgment is not admissible except in a proceeding to determine costs.

The practical value of the common law rule has been greatly diminished by its inapplicability to admissions of fact, even though made in the course of compromise negotiations, unless hypothetical, stated to be "without prejudice," or so connected with the offer as to be inseparable from it. McCormick §251, pp. 540–541. An inevitable effect is to inhibit freedom of communication with respect to compromise, even among lawyers. Another effect is the

generation of controversy over whether a given statement falls within or without the protected area. These considerations account for the expansion of the rule herewith to include evidence of conduct or statements made in compromise negotiations, as well as the offer or completed compromise itself. For similar provisions see California Evidence Code §§1152, 1154.

The policy considerations which underlie the rule do not come into play when the effort is to induce a creditor to settle an admittedly due amount for a lessor sum. McCormick §251, p. 540. Hence the rule requires that the claim be disputed as to either validity or amount.

The final sentence of the rule serves to point out some limitations upon its applicability. Since the rule excludes only when the purpose is proving the validity or invalidity of the claim or its amount, an offer for another purpose is not within the rule. The illustrative situations mentioned in the rule are supported by the authorities. As to proving bias or prejudice of a witness, see Annot., 161 A.L.R. 395, *contra, Fenberg v. Rosenthal*, 348 Ill. App. 510, 109 N.E.2d 402 (1952), and negativing a contention of lack of due diligence in presenting a claim, 4 Wigmore §1061. An effort to "buy off" the prosecution or a prosecuting witness in a criminal case is not within the policy of the rule of exclusion. McCormick §251, p. 542.

For other rules of similar import, see Uniform Rules 52 and 53; California Evidence Code §1152, 1154; Kansas Code of Civil Procedure §§60–452, 60–453; New Jersey Evidence Rules 52 and 53.

Notes of Committee on the Judiciary, House Report No. 93–650

Under existing federal law evidence of conduct and statements made in compromise negotiations is admissible in subsequent litigation between the parties. The second sentence of Rule 408 as submitted by the Supreme Court proposed to reverse that doctrine in the interest of further promoting non-judicial settlement of disputes. Some agencies of government expressed the view that the Court formulation was likely to impede rather than assist efforts to achieve settlement of disputes. For one thing, it is not always easy to tell when compromise negotiations begin, and informal dealings end. Also, parties dealing with government agencies would be reluctant to furnish factual information at preliminary meetings; they would wait until "compromise negotiations" began and thus hopefully effect an immunity for themselves with respect to the evidence supplied. In light of these considerations, the Committee recast the Rule so that admissions of liability or opinions given during compromise negotiations continue inadmissible, but evidence of unqualified factual assertions is admissible. The latter aspect of the Rule is drafted, however, so as to preserve other possible objections to the introduction of such evidence. The Committee intends no modification of current law whereby a party may protect himself from future use of his statements by couching them in hypothetical conditional form.

Notes of Committee on the Judiciary, Senate Report No. 93–1277

This rule as reported makes evidence of settlement or attempted settlement of a disputed claim inadmissible when offered as an admission of liability or the amount of liability. The purpose of this rule is to encourage settlements which would be discouraged if such evidence were admissible.

ADD 21

Under present law, in most jurisdictions, statements of fact made during settlement negotiations, however, are excepted from this ban and are admissible. The only escape from admissibility of statements of fact made in a settlement negotiation is if the declarant or his representative expressly states that the statement is hypothetical in nature or is made without prejudice. Rule 408 as submitted by the Court reversed the traditional rule. It would have brought statements of fact within the ban and made them, as well as an offer of settlement, inadmissible.

The House amended the rule and would continue to make evidence of facts disclosed during compromise negotiations admissible. It thus reverted to the traditional rule. The House committee report states that the committee intends to preserve current law under which a party may protect himself by couching his statements in hypothetical form [See House Report No. 93–650 above]. The real impact of this amendment, however, is to deprive the rule of much of its salutary effect. The exception for factual admissions was believed by the Advisory Committee to hamper free communication between parties and thus to constitute an unjustifiable restraint upon efforts to negotiate settlements—the encouragement of which is the purpose of the rule. Further, by protecting hypothetically phrased statements, it constituted a preference for the sophisticated, and a trap for the unwary.

Three States which had adopted rules of evidence patterned after the proposed rules prescribed by the Supreme Court opted for versions of rule 408 identical with the Supreme Court draft with respect to the inadmissibility of conduct or statements made in compromise negotiations. [Nev. Rev. Stats. §48.105; N. Mex. Stats. Anno. (1973 Supp.) §20–4–408; West's Wis. Stats. Anno. (1973 Supp.) §904.08].

For these reasons, the committee has deleted the House amendment and restored the rule to the version submitted by the Supreme Court with one additional amendment. This amendment adds a sentence to insure that evidence, such as documents, is not rendered inadmissible merely because it is presented in the course of compromise negotiations if the evidence is otherwise discoverable. A party should not be able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation.

Notes of Conference Committee, House Report No. 93–1597

The House bill provides that evidence of admissions of liability or opinions given during compromise negotiations is not admissible, but that evidence of facts disclosed during compromise negotiations is not inadmissible by virtue of having been first disclosed in the compromise negotiations. The Senate amendment provides that evidence of conduct or statements made in compromise negotiations is not admissible. The Senate amendment also provides that the rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.

The House bill was drafted to meet the objection of executive agencies that under the rule as proposed by the Supreme Court, a party could present a fact during compromise negotiations and thereby prevent an opposing party from offering evidence of that fact at trial even though such evidence was obtained from independent sources. The Senate amendment expressly precludes this result.

ADD 22

The Conference adopts the Senate amendment.

Committee Notes on Rules—2006 Amendment

Rule 408 has been amended to settle some questions in the courts about the scope of the Rule, and to make it easier to read. First, the amendment provides that Rule 408 does not prohibit the introduction in a criminal case of statements or conduct during compromise negotiations regarding a civil dispute by a government regulatory, investigative, or enforcement agency. *See, e.g., United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir. 1994) (admissions of fault made in compromise of a civil securities enforcement action were admissible against the accused in a subsequent criminal action for mail fraud). Where an individual makes a statement in the presence of government agents, its subsequent admission in a criminal case should not be unexpected. The individual can seek to protect against subsequent disclosure through negotiation and agreement with the civil regulator or an attorney for the government.

Statements made in compromise negotiations of a claim by a government agency may be excluded in criminal cases where the circumstances so warrant under Rule 403. For example, if an individual was unrepresented at the time the statement was made in a civil enforcement proceeding, its probative value in a subsequent criminal case may be minimal. But there is no absolute exclusion imposed by Rule 408.

In contrast, statements made during compromise negotiations of other disputed claims are not admissible in subsequent criminal litigation, when offered to prove liability for, invalidity of, or amount of those claims. When private parties enter into compromise negotiations they cannot protect against the subsequent use of statements in criminal cases by way of private ordering. The inability to guarantee protection against subsequent use could lead to parties refusing to admit fault, even if by doing so they could favorably settle the private matter. Such a chill on settlement negotiations would be contrary to the policy of Rule 408.

The amendment distinguishes statements and conduct (such as a direct admission of fault) made in compromise negotiations of a civil claim by a government agency from an offer or acceptance of a compromise of such a claim. An offer or acceptance of a compromise of any civil claim is excluded under the Rule if offered against the defendant as an admission of fault. In that case, the predicate for the evidence would be that the defendant, by compromising with the government agency, has admitted the validity and amount of the civil claim, and that this admission has sufficient probative value to be considered as evidence of guilt. But unlike a direct statement of fault, an offer or acceptance of a compromise is not very probative of the defendant's guilt. Moreover, admitting such an offer or acceptance could deter a defendant from settling a civil regulatory action, for fear of evidentiary use in a subsequent criminal action. *See, e.g.*, Fishman, *Jones on Evidence, Civil and Criminal*, §22:16 at 199, n.83 (7th ed. 2000) ("A target of a potential criminal investigation may be unwilling to settle civil claims against him if by doing so he increases the risk of prosecution and conviction.").

The amendment retains the language of the original rule that bars compromise evidence only when offered as evidence of the "validity," "invalidity," or "amount" of the disputed claim. The intent is to retain the extensive case law finding Rule 408 inapplicable when compromise

evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim. *See, e.g., Athey v. Farmers Ins. Exchange*, 234 F.3d 357 (8th Cir. 2000) (evidence of settlement offer by insurer was properly admitted to prove insurer's bad faith); *Coakley & Williams v. Structural Concrete Equip.*, 973 F.2d 349 (4th Cir. 1992) (evidence of settlement is not precluded by Rule 408 where offered to prove a party's intent with respect to the scope of a release); *Cates v. Morgan Portable Bldg. Corp.*, 708 F.2d 683 (7th Cir. 1985) (Rule 408 does not bar evidence of a settlement when offered to prove a breach of the settlement agreement, as the purpose of the evidence is to prove the fact of settlement as opposed to the validity or amount of the underlying claim); *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284 (6th Cir. 1997) (threats made in settlement negotiations were admissible; Rule 408 is inapplicable when the claim is based upon a wrong that is committed during the course of settlement negotiations). So for example, Rule 408 is inapplicable if offered to show that a party made fraudulent statements in order to settle a litigation.

The amendment does not affect the case law providing that Rule 408 is inapplicable when evidence of the compromise is offered to prove notice. *See, e.g., United States v. Austin*, 54 F.3d 394 (7th Cir. 1995) (no error to admit evidence of the defendant's settlement with the FTC, because it was offered to prove that the defendant was on notice that subsequent similar conduct was wrongful); *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987) (in a civil rights action alleging that an officer used excessive force, a prior settlement by the City of another brutality claim was properly admitted to prove that the City was on notice of aggressive behavior by police officers).

The amendment prohibits the use of statements made in settlement negotiations when offered to impeach by prior inconsistent statement or through contradiction. Such broad impeachment would tend to swallow the exclusionary rule and would impair the public policy of promoting settlements. *See McCormick on Evidence* at 186 (5th ed. 1999) ("Use of statements made in compromise negotiations to impeach the testimony of a party, which is not specifically treated in Rule 408, is fraught with danger of misuse of the statements to prove liability, threatens frank interchange of information during negotiations, and generally should not be permitted."). *See also EEOC v. Gear Petroleum, Inc.*, 948 F.2d 1542 (10th Cir. 1991) (letter sent as part of settlement negotiation cannot be used to impeach defense witnesses by way of contradiction or prior inconsistent statement; such broad impeachment would undermine the policy of encouraging uninhibited settlement negotiations).

The amendment makes clear that Rule 408 excludes compromise evidence even when a party seeks to admit its own settlement offer or statements made in settlement negotiations. If a party were to reveal its own statement or offer, this could itself reveal the fact that the adversary entered into settlement negotiations. The protections of Rule 408 cannot be waived unilaterally because the Rule, by definition, protects both parties from having the fact of negotiation disclosed to the jury. Moreover, proof of statements and offers made in settlement would often have to be made through the testimony of attorneys, leading to the risks and costs of disqualification. *See generally Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 828 (2d Cir. 1992) (settlement offers are excluded under Rule 408 even if it is the offeror who seeks to admit them; noting that the "widespread admissibility of the substance of settlement offers could bring with it a rash of motions for disqualification of a party's chosen counsel who would likely become a witness at trial").

ADD 24

The sentence of the Rule referring to evidence "otherwise discoverable" has been deleted as superfluous. *See, e.g.*, Advisory Committee Note to Maine Rule of Evidence 408 (refusing to include the sentence in the Maine version of Rule 408 and noting that the sentence "seems to state what the law would be if it were omitted"); Advisory Committee Note to Wyoming Rule of Evidence 408 (refusing to include the sentence in Wyoming Rule 408 on the ground that it was "superfluous"). The intent of the sentence was to prevent a party from trying to immunize admissible information, such as a pre-existing document, through the pretense of disclosing it during compromise negotiations. *See Ramada Development Co. v. Rauch*, 644 F.2d 1097 (5th Cir. 1981). But even without the sentence, the Rule cannot be read to protect pre-existing information simply because it was presented to the adversary in compromise negotiations.

*Changes Made After Publication and Comments*. In response to public comment, the proposed amendment was changed to provide that statements and conduct during settlement negotiations are to be admissible in subsequent criminal litigation only when made during settlement discussions of a claim brought by a government regulatory agency. Stylistic changes were made in accordance with suggestions from the Style Subcommittee of the Standing Committee. The Committee Note was altered to accord with the change in the text, and also to clarify that fraudulent statements made during settlement negotiations are not protected by the Rule.

Committee Notes on Rules—2011 Amendment

The language of Rule 408 has been amended as part of the general restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

Rule 408 previously provided that evidence was not excluded if offered for a purpose not explicitly prohibited by the Rule. To improve the language of the Rule, it now provides that the court may admit evidence if offered for a permissible purpose. There is no intent to change the process for admitting evidence covered by the Rule. It remains the case that if offered for an impermissible purpose, it must be excluded, and if offered for a purpose not barred by the Rule, its admissibility remains governed by the general principles of Rules 402, 403, 801, etc.